No. 14395

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

THE STATE OF MONTANA,

     Plaintiff and Respondent,

  vs.

NICK A. PONCELET,

     Defendant and Appellant.

---

Appeal from: District Court of the First Judicial District,
      Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

 For Appellant:

   Jackson and Kelly, Helena, Montana
   Gregory Jackson argued and Douglas Kelly argued,
   Helena, Montana

 For Respondent:

   Ann Smoyer argued, Helena, Montana

---

        Submitted: January 14, 1980

        Decided APR 2 4 1980

Filed: APR 2 4 1980

_Thomas J. Kearney_
         Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment entered in the District Court of the First Judicial District, in and for the County of Lewis and Clark, the Honorable Gordon R. Bennett presiding.

Defendant is a resident of Whitefish, Montana. He has been employed by Teleprompter, Inc., for the past fifteen years working as a microwave engineer. In October 1976, defendant was informed by the Montana Department of Revenue that the State had not received income tax returns from him for the years 1973, 1974, 1975, and 1976. In those years, the Department had received information indicating that defendant had earned the following incomes: 1973--$10,400.00; 1974--$11,017.50; 1975--$11,020.80; 1976--$10,976.56. Enclosed with the Department's letter to defendant were detailed income tax forms and instructions. Defendant responded to the letter by requesting copies of Montana code sections regarding the collection and payment of taxes and the Montana Constitution. The Department, in turn, responded to defendant's request by indicating that certain copying fees had to be enclosed for the copying of the requested materials. Defendant again wrote a letter to the Department repeating his request. On November 21, 1976, five days after defendant's second letter, defendant mailed incomplete tax returns for the years 1973, 1974, and 1975 to the Department with an accompanying letter. The letter stated:

> "I have taken the Fifth Amendment stand on my
> Federal Tax Returns and since the Montana De-
> partment of Revenue and the Federal Government
> work hand in hand I cannot give you any informa-
> tion without you passing it on to the I.R.S..
> Therefore, I am forced to do the same with the

Montana Department of Revenue, because any in-
formation that may tend to incriminate me that
is given to you will be passed on to the I.R.S.
and may incriminate me through a third party."

In the same letter, defendant requested immunity from

prosecution and added that, "if you do not agree with me and

should decide to prosecute me, I will make a good faith

challenge in a court of law before a jury of my peers."

Defendant also asked the State to schedule a conference to

discuss his taxes.

Defendant filed an improper tax return on August 16,

1977, for the calendar year 1976.

On August 3, 1977, defendant was charged with four

counts of "intentionally failing to make or render a return

or to supply information or both" under section 84-4924(3)

and (4), R.C.M. 1947, now section 15-30-321(3) and (4), MCA.

A jury trial began on February 21, 1978, and lasted three

days.  At the end of the trial, the jury deliberated and

returned a verdict of guilty on all four counts.  Defendant

moved for a new trial, but the motion was denied.  On April

19, 1978, the District Court entered judgment of conviction,

and defendant now appeals.

Twelve issues are raised for our consideration upon

appeal.  We find, however, that it is only necessary to

discuss eleven of the issues because of the disposition of

this case.  The issues raised by defendant are:

1.  Whether the District Court erred in instructing the

jury that "the law presumes that a person intends the ordi-

nary consequences of his voluntary acts."

2.  Whether prosecution for the charges contained in

the Information was barred by the statute of limitations.

3.  Whether the District Court erred in failing to

admit defendant's withholding statement.

4. Whether the prosecuting attorneys were properly appointed special deputy county attorneys.

5. Whether the District Court erred in denying defendant's motion for substitution of judge.

6. Whether the District Court erred in limiting defendant's voir dire examination of the jury.

7. Whether the District Court erred in excluding the testimony of William Koerner as an expert witness for defendant.

8. Whether the District Court erred in denying defendant's motion for a change of venue.

9. Whether defendant's assertion of his Fifth Amendment privilege was a defense to the charges contained in the information.

10. Whether the District Court erred in denying defendant's instructions.

11. Whether defendant, proceeding pro se, is entitled to have rules of law and procedure applied less strictly against him.

12. Whether the evidence presented clearly preponderated against the findings of the jury.

At the outset, it is important to clear up any confusion that may exist with regard to the charges brought by the State in this case. Here, prosecution was commenced by the State against defendant for failure to file an income tax return or supply information, or both. The Information states that defendant is charged with four counts of "intentionally failing to make or render a return or to supply information or both." The prosecution was not commenced for any failure to pay taxes. What the prosecution stems from, rather, is the filing of an incomplete or improper return.

-4-

Defendant here submitted signed returns with asterisks inserted on several lines, accompanied by a blanket assertion of his Fifth Amendment privilege. According to well-established legal precedent, returns which merely contain an individual's social security number, name, and signature and which are accompanied by a blanket Fifth Amendment assertion of a privilege are not properly filed returns as provided by law. See United States v. Porth (10th Cir. 1970), 426 F.2d 519, cert. denied 400 U.S. 824 (1970); United States v. Jordan (7th Cir. 1975), 508 F.2d 750, cert. denied 423 U.S. 842 (1976); United States v. Pryor (8th Cir. 1978), 574 F.2d 440. This case, then, concerns the failure to file a proper return.

As his first issue, defendant contends that the District Court erred in instructing the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." This instruction, commonly referred to as the "Sandstrom instruction," has been considered by this Court in several recent cases. The United States Supreme Court declared it to be unconstitutional because it has, in the minds of reasonable jurors, conclusive or persuasion-shifting effect. Sandstrom v. Montana (1979), _____ U.S. _____, 99 S.Ct. 2450, 61 L.Ed.2d 39.

The State contends that we should not consider defendant's first issue because defendant did not object to the giving of the challenged instruction at trial. The State submits that the issue cannot now be raised for the first time on appeal. Although the State's point is well taken, we note that an appellate court may, in some circumstances, raise plain error upon appeal. We find that the effect of the Sandstrom instruction deserves consideration, especially because defendant appeared pro se in this matter.

The test for determining error in instructions similar or identical to those involved in Sandstrom was enunciated by the United States Supreme Court as analyzing the "way in which a reasonable juror could have interpreted the instruction." This, of course, involves assessing the impact of the challenged instruction in the context of other instructions given in the case. Several instructions were given in this case with respect to intent and the proof thereof. Instruction No. 11 indicated that intent was a necessary element of the offense to be proven by the State beyond a reasonable doubt. Instruction No. 1 stated that defendant was afforded a presumption of innocence, and Instruction No. 2 required that the State prove every element of the offense beyond a reasonable doubt. Instruction No. 7 was identical to the wording of the so-called "Sandstrom instruction" and afforded the State a presumption of intent. "Presumption" was defined in Instruction No. 3, which stated:

> "Instruction No. 3: A presumption is a deduction which the law expressly directs to be made from particular facts. Unless declared by law to be conclusive, it may be controverted by other evidence, direct or circumstantial, but unless so controverted the jury is bound to find in accordance with the presumption.

> "In this regard, you are reminded in a criminal case, the defendant is presumed innocent until the contrary is proven beyond a reasonable doubt. This presumption carries the force of law and can only be controverted by evidence which leaves the minds of jurors in that condition that they can say that they feel an abiding conviction, to a moral certainty, of the truth of the charge."

Instruction Nos. 9 and 10 also permitted a finding of intent through inference:

> "Instruction No. 9: The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots, nor lunatics, nor af-

fected with insanity. The intent need not be proved by direct evidence, but may be inferred from acts, conduct and circumstances appearing in evidence and warranting such inference beyond a reasonable doubt.

"Instruction No. 10: The element of intent in every contested case must necessarily be determined from facts and circumstances of the particular case--this for the reason that criminal intent, being a state of mind, is rarely susceptible of direct or positive proof and there must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence."

Analyzing these instructions in the way or ways a reasonable juror could have interpreted them, we believe two possible interpretations might have been reached--one permissible and the other impermissible.

On one hand, a reasonable juror could have understood the instructions as requiring the State to fully carry its burden. The element of intent could have been properly and permissibly found through inference as stated in Instruction Nos. 9 and 10. There would have been no conclusive or persuasion-shifting effect. Interpreting the instructions as permissible, the jurors would have been free to accept or reject the instructions without allocating any additional burden to the defendant in coming forward with further proof. See State v. Coleman (1979), ____ Mont. ____, 579 P.2d 732, 36 St.Rep. 2237; State v. Bad Horse (1980), ____ Mont. ____, 605 P.2d 1113, 37 St.Rep. 45.

On the other hand, a reasonable juror could have also interpreted the instructions as mandatory. In particular, the jurors could have interpreted Instruction No. 7 as allowing for no discretion and directing the jurors to find the element of intent. State v. Sandstrom (1979), ____ Mont. ____, 603 P.2d 244, 36 St.Rep. 2099. This interpretation would have had an impermissible effect and might have

-7-

been easily reached considering the context of Instruction No. 3. Where an impermissible interpretation could have been gleaned from the instructions by a reasonable juror, we cannot declare beyond a reasonable doubt that the error complained of did not contribute to the verdict.

The State urges that, even if there was error in the instructions, the error was harmless. Given the nature of evidence presented in this case, however, we find the application of the doctrine of harmless constitutional error to be unpersuasive. There is no overwhelming evidence here that is of the convincing quality or character as that present in State v. Hamilton (1980), _____ Mont. _____, 605 P.2d 1121, 37 St.Rep. 70, and State v. McKenzie (1980), _____ Mont. _____, _____ P.2d _____, 37 St.Rep. 325.

Having determined the error to be prejudicial and harmful, this case is remanded to the District Court for retrial consistent with the following portions of this opinion and the guidelines enumerated by the United States Supreme Court in Sandstrom.

As his second issue, defendant contends that any prosecution for the offenses charged in the Information was barred by the statute of limitations. Defendant was charged under section 84-4924(3) and (4), R.C.M. 1947, now section 15-30-321(3) and (4), MCA, for failure to file complete income tax returns for the years 1973, 1974, 1975 and 1976. Each count was a misdemeanor punishable by a fine not to exceed $1,000 or one year imprisonment, or both.

Defendant submits that section 45-1-205(2)(b), MCA, is the statute of limitation applicable to each of the four counts. The statute sets forth a one year statute of limitation for misdemeanors. Defendant contends that the State is

-8-

barred from prosecuting any count where prosecution commenced on August 3, 1977, more than one year from the date upon which the last offense was committed.

We agree.

We find that section 15-30-322, MCA, is not the controlling statute of limitations for the offenses charged in this case. The language "[e]xcept as otherwise provided by law" controls as to when a misdemeanor is removed from the bar of section 45-1-205(2)(b), MCA. Section 15-30-322, MCA, specifically applies only to actions by the attorney general to recover due taxes, penalties and interest "at any time." This is not an action to recover unpaid taxes. It is an action to create criminal responsibility for not filing a proper income tax return. The authorization extended to the attorney general under section 15-30-322, MCA, is for a civil action to collect governmental revenue. An open right in the State to collect its revenue "at any time" in a civil action should not be extended to cover a criminal matter. Parenthetically, we note that the legislature has now provided a five-year statute of limitations for this type of criminal prosecution, section 15-30-324, MCA, adopted in 1979.

Defendant's third issue is whether the court erred in failing to admit his withholding statement. Defendant apparently contends that the statement was relevant to show that taxes had been paid and withheld. It is important to reiterate here that this is not a prosecution stemming from a failure to pay taxes. Rather, defendant was charged and found guilty of failure to file a proper return. The fact that an individual has federal and state income taxes withheld from his gross income is not a sufficient reason to

abate the requirement of filing a proper, completed Montana Individual Income Tax Return. The filing requirement is contained in section 15-30-142, MCA. This statute, coupled with section 15-30-321(3), MCA, sets forth the criminal penalties for not filing, and no mention is made concerning withholding tax.

In the presentation of the State's case, evidence of documents pertaining to defendant's employment was presented to show defendant's gross income for the years in question. Defendant argues that it is the law in Montana that, when part of a transaction is proven, the whole is admissible. Rule 106, Mont.R.Evid. However, in this case, the pay records referred to were used to develop the defendant's income, and references to the withholding of taxes were peripheral to the main issue. The offering of the with-holding statements by defendant were irrelevant to the issue of whether or not he filed returns for the years in ques-tion.

Defendant relies on Varn v. Butte Electric Ry. Co. (1926), 77 Mont. 124, 249 P. 1070, as authority for allowing the admission of withholding statements. The issue in Varn was whether an entire ordinance governing street cars was admissible. The Court there held that, when one part of an ordinance was admitted into evidence, the trial court should have allowed the entire ordinance to be admitted. Varn, however, is factually distinguishable from the situation here. Here, defendant's withholding statements did not go to the intent needed for failure to file his returns. In fact, the evidence had no probative value on the charge in the case at bar. The admission of such evidence could well have distracted the jury from the charge at hand. See

United States v. Gorman (7th Cir. 1968), 393 F.2d 209, cert. denied 393 U.S. 832, reh. denied 395 U.S. 917. We find no error in the court's handling of this issue.

Defendant's next issue is whether the attorneys who prosecuted this action, Ann Smoyer and Robert W. Corcoran, were properly appointed special deputy county attorneys in this matter. Defendant contends that the appointment of Ms. Smoyer and Mr. Corcoran violated section 7-4-2703, MCA. That statute provides that a county attorney of a first or second class county can only appoint one chief deputy and one deputy county attorney. Defendant argues that, because Lewis and Clark County already had such number of deputies, Ms. Smoyer and Mr. Corcoran were improperly appointed here.

We find, however, that there is ample authority to support the fact that the attorneys acted under proper and lawful authority to prosecute this action. Defendant submits that section 7-4-2703, MCA, establishes the maximum number of deputy county attorneys allowed by law. An examination of other statutes and cases, however, reveals otherwise. Section 7-4-2401, MCA, provides for the appointment of such additional deputy county attorneys as may be reasonably necessary to discharge the duties of the office. There is also early authority in Montana, under a statutory predecessor to section 7-4-2703, MCA, which recognizes the authority of the county attorney to appoint additional deputies in certain circumstances. State v. Crouch (1924), 70 Mont. 551, 227 P. 818. Independent of this ground, the attorney general is given the authority under section 15-30-322, MCA, to recover the amount of any taxes, penalties and interest under the revenue laws of this State. Here, the file reflects that Ms. Smoyer and Mr. Corcoran were not only appointed

-11-

by Lewis and Clark County Attorney Charles Gravely as deputy county attorneys, but were also appointed by Attorney General Mike Greely as assistant attorney generals. That being the case, they had lawful authority to prosecute the matter here.

Defendant's fifth issue is whether the court erred in denying his motion for substitution of judge. Defendant filed an affidavit of disqualification on October 11, 1977, in which he alleged that the Honorable Gordon R. Bennett was biased and prejudiced. The filing of the affidavit came approximately two months after the information was filed. The affidavit was denied without a hearing on October 13, 1977, because it was not filed, pursuant to a rule of this Court, within ten days of the time Judge Bennett assumed jurisdiction of the case. Defendant argues that the motion for disqualification should have been granted because Judge Bennett had a duty to inform defendant of this Court's rule concerning the disqualification and substitution of judges. That rule is codified in section 3-1-801, MCA, and provides in pertinent part:

> ". . . Whenever a judge is assigned a case for 10 consecutive days and the attorneys of record on both sides have knowledge of the assignment for that period of time, and if during this time no motion for substitution of a judge is filed against him, all rights to move for substitution of a judge shall be deemed waived by all parties unless the presiding judge disqualified himself thereafter in which case the right to move for substitution of a new judge is reinstated and the 10 day period starts running anew . . ."

Under the above rule, if the ten-day period does not expire, a party in a criminal case is automatically entitled to one substitution of a judge. When the period expires, however, a judge may only be disqualified for cause under paragraph 6 of section 3-1-801, MCA, which provides:

-12-

"Whenever a party to any proceeding in any court makes and files a timely and sufficient affidavit that a judge or justice of the peace, before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge or justice of the peace shall proceed no further therein, but another judge or justice of the peace shall be assigned to hear such disqualification proceeding by the chief justice of the Supreme Court, or by a district judge, if the affidavit is against a justice of the peace, police or municipal court judge. The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than 20 days before the original date of trial, or good cause shall be shown for failure to file it within such time. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

Here, defendant chose to act as his own counsel. There was no duty on the part of Judge Bennett to constantly keep in touch with defendant during the preparation of this case and to tell him what the law is concerning disqualifications. Defendant appeared before Judge Bennett on August 18, 1977, for his initial appearance. He had filed many pleadings concerning venue which had been disposed of in Judge Bennett's court. He was well aware that Judge Bennett was presiding and failed to challenge him within the proper time set forth. See In re Petition of Larocque (1961), 139 Mont. 405, 406, 365 P.2d 950; State v. Parker (1973), 161 Mont. 394, 397, 506 P.2d 850. Judge Bennett properly denied the affidavit because it was not timely filed. Paragraph 6 of section 3-1-801, MCA, does not apply because the affidavit was not accompanied by a certificate of good faith.

Defendant's sixth issue is whether the District Court erred in limiting defendant's voir dire examination of the jury. Prior to voir dire, the State sought, through a motion in limine, to restrict defendant from inquiring into the religious beliefs of the prospective jurors. In connection with the motion, the court asked the following questions:

"THE COURT: Do you intend in any way to bring up the religious beliefs of the prospective jurors and the witnesses in this case?

"MR. PONCELET: I will not bring up the secular beliefs of the jurors, but, I will bring up, under the First Amendment of the Constitution of the United States, the freedom of belief and how you want to believe, and how you feel with respect to religion.

"THE COURT: That's fine, but keep people's secular beliefs out of it. Are you willing to do that?

"MR. PONCELET: Yes."

It has long been held in this state and other jurisdictions that a trial judge has wide discretion in conducting voir dire. See Aldridge v. United States (1930), 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054; State v. Allison (1948), 122 Mont. 120, 199 P.2d 279; State ex rel. Stephens v. District Court (1976), 170 Mont. 22, 27, 550 P.2d 385. We find that the trial court here properly limited inquiry into the jurors' belief in God rather than detailed inquiries into the prospective jurors' secular beliefs. In Yarborough v. United States (1956), 230 F.2d 56, cert. denied 351 U.S. 969, the court held that a defendant prosecuted for tax evasion was not entitled to voir dire jurors on their religious beliefs. See also, 54 A.L.R.2d 1204; United States v. Mallinowski (Penn. 1972), 347 F.Supp. 347, 355, aff'd (3rd Cir. 1972), 472 F.2d 850, cert. denied 411 U.S. 970. Given the wide discretion allowed a trial judge, the lack of relevancy of religion to the issues at bar, and the permitted inquiry into the jurors' general belief in God, defendant's contention is without merit.

Defendant's next issue is whether the court committed error in denying the testimony of defendant's witness, William Koerner. Koerner was offered by defendant as an

-14-

expert witness on the Constitution.  Koerner's background was that he had taught classes on the United States Constitution and United States Government in public schools and the military and that he had advised two legislators about amendments to be offered and counseled them in general before coming to the legislature.

When defendant had established the foundation to offer Koerner as an expert witness and then proceeded to question him, the following colloquy occurred between defendant and the court:

> "MR. PONCELET:  Your honor, this person here is an expert on the Constitution and he knows it frontwards and backwards.
>
> "THE COURT:  He is an expert on the constitutional law.  The jury is not concerned with the views on the constitutional law.  The jury is concerned with the facts in this case.  That is what they must hear.
>
> ". . .
>
> "THE COURT:  Yes.  We will submit the law to the jury when the time comes, and if you are dissatisfied with the way we submit the law, you have your appeal.
>
> ". . .
>
> "THE COURT:  The jury will get the law, the constitutional law, as well as the statutory law, from the Court.  You may submit any ideas that you have on the law to the Court at the time that the instructions to the jury are being settled, but we don't get the law from the testimony of witnesses."

Defendant argues that the ruling of the trial court was improper and that he should have been allowed his right to present such expert testimony.  We find, however, that the trial court's ruling was correct.  The interpretation and application of the United States Constitution was a question of law and not a fact in issue.  It was a determination to be made by the trial judge within his statutory powers.

Instructing the jury on the law necessary for the jury's rendering of a verdict in a criminal case is a duty within the exclusive province of the trial judge. Sections 26-1-201 and 46-16-401(4)(b), MCA. The ruling was proper and did not prejudice the substantial rights of defendant. See, United States v. Afflerbach (10th Cir. 1976), 547 F.2d 522, 524, where the court stated:

> "The defendant does not agree with the income tax laws nor the general fiscal system of the government, and he apparently believes this strongly, but this is not a defense."

The next issue concerns whether the court erred in denying defendant's motion for a change of venue. We first note, in connection with the issue, that defendant relies here on a portion of the lower court proceedings for which a transcript has not been submitted to us. The State points out that it is an appellant's duty to order the entire transcript for the proceedings and argues that the matter is not properly before us and therefore should not be considered upon appeal. Section 46-20-302, MCA. However, in view of the fact that defendant appeared pro se in this matter, we will summarily handle the matter by noting that we find no error here. Venue properly lies in Lewis and Clark County, the place where the tax returns were required to be filed by law.

Under section 15-30-144, MCA, income tax returns are required to be filed with the Department of Revenue. The Department, in turn, is required by law to be located in Helena, Montana. Section 2-15-112(1)(i), MCA. Consequently, the offense of failing to file a return or provide information as set out in section 15-30-321(3), MCA, is committed in Lewis and Clark County, where Helena is located. There-

fore venue properly lies in Lewis and Clark County. Section 46-3-101(1), MCA, provides that, in all criminal prosecutions, trial shall be in the county where the offense was committed unless otherwise provided by law.

Defendant's next two issues concern whether the trial court erred in denying defendant's instructions. In particular, we are concerned with the issues of whether defendant's assertion of his Fifth Amendment privilege was a proper defense to the charges contained in the Information and whether the court erred in not giving an instruction on defendant's failure to testify.

As previously noted, defendant submitted signed income tax returns to the Department of Revenue with asterisks inserted on several lines, accompanied with a blanket assertion that he did not have to supply any further information under his Fifth Amendment right. Under well-established precedent, these returns were not properly filed returns as provided by law, and the State, therefore, prosecuted the defendant for failure to provide proper returns. Defendant contends, nevertheless, that the assertion of his Fifth Amendment privilege was a proper defense.

It is well established that the blanket assertion of privilege against self-incrimination in a return is not a proper defense to a prosecution for failure to file a complete return. United States v. Ming (7th Cir. 1972), 466 F.2d 1000, cert. denied 409 U.S. 915, reh. denied 409 U.S. 1051; United States v. Afflerbach (10th Cir. 1976), 547 F.2d 522; United States v. Silkman (8th Cir. 1976), 543 F.2d 1218; United States v. Johnson (5th Cir. 1978), 577 F.2d 1304. There is no constitutional privilege granting an

individual the right to refuse to answer all questions on an income tax return. Nor can the broad refusal to supply information or answer questions be a proper defense raised at trial. The jury cannot be instructed that a blanket assertion of the Fifth Amendment privilege is a defense entitling the defendant to a complete acquittal of the charges. In Johnson, 577 F.2d at 1310, the court stated:

> "Johnson contends that the district court erred in the course of instructing the jury concerning his claim of privilege under the Fifth Amendment on his federal income tax return. He reasons, in effect, that a good faith blanket claim of the Fifth Amendment privilege automatically and completely insulates a taxpayer from prosecution for failure to file a return, and the jury should have been so instructed. This reasoning was rejected over fifty years ago when a unanimous Supreme Court, through Mr. Justice Holmes, held a taxpayer 'could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government's blank would bring him into danger of the law.' [Citation omitted.]
>
> "Johnson errs in his interpretation of his rights under the Fifth Amendment in the context of income tax laws. He contends that his privilege against self-incrimination permits him to 'stand mute' and refuse to cooperate at all in the determination of his tax liability. He argues that he has a privilege, under the Fifth Amendment, to refuse to disclose any income information since he claims that some of his income was derived from illegal activities. Therefore, he would have us conclude that the 'return' which he supplied in 1970 was proper in its blanket assertion of the Fifth Amendment. He also seems to justify his complete failure to file in 1971 under the Fifth Amendment. In addition, he argues that he may forever refuse to cooperate with the courts and the IRS in this matter, and his assertion of the privilege cannot be tested or questioned. Under well established precedents, Johnson is wrong in these contentions."

This is not to say, however, that the Fifth Amendment privilege, asserted properly, may not protect the erroneous taxpayer by providing a defense to the prosecution if the

jury finds that the claim, though erroneous, was made in good faith. A proper assertion of the privilege is clearly, however, not a blanket assertion:

> "Three principles may be distilled from the authorities: (1) the privilege must be claimed specifically in response to particular questions, not merely in a blanket refusal to furnish any information; (2) the claim is to be reviewed by a judicial officer who determines whether the information sought would tend to incriminate; (3) the witness or defendant himself is not the final arbiter of whether or not the information sought would tend to incriminate. [Citations omitted.]" Johnson, 577 F.2d at 1311.

Defendant in this case offered to no one any particular reason for his assertion of a Fifth Amendment privilege. In his tax return, there was no indication as to what source of income he was claiming that privilege. Defendant did not, for example, attempt to comply with the law and list his alleged ill-gotten gains as "miscellaneous" income. See Johnson, supra. Defendant did not indicate anything more on his tax return than a blanket assertion of his Fifth Amendment right to the Department of Revenue. Nor did he claim the privilege in response to particular questions before the judge in chambers at trial, who could have decided if the privilege was applicable. See Johnson, supra; United States v. Wade (1978), 42 AFTR2d 78-6295. Nor did he claim that the privilege was related to another prosecution for a criminal offense, or even the possibility of criminal prosecution. See Garner v. United States (1976), 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370. Rather, there was simply a broad or blanket assertion of the privilege.

Defendant's assertion was much like a defendant refusing to give his name at trial, implying that, for some reason, to release such information, would somehow incriminate him or subject him to criminal prosecution. It vio-

lates common sense to say that an assertion of this kind would be a defense which would completely insulate an individual from criminal prosecution. To have asserted the privilege properly, defendant should have followed the guidelines of Wade and Johnson. The trial court should have then instructed the jury accordingly. Under the circumstances in which the privilege was asserted here, however, we cannot say that the trial court acted improperly.

Defendant also submits that it was error for the court to deny several other instructions. Defendant submitted approximately forty-eight instructions to the trial court, dealing with everything from what he thought the Constitution said to the actual direction to the jury that they could disregard the court's instructions and acquit him despite the law given. Many of the statements proposed by the instructions were irrelevant, and the court properly refused them. Two instructions are representative of the instructions generally offered by defendant and illustrate the problem presented to the trial court:

"Defendant's proposed instruction No. 42. You are instructed that the Declaration of Independence reads in part: 'He (the King of Great Britain) has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people and set out their substance.'

"Defendant's proposed instruction No. 43. You are instructed that the Declaration of Independence reads in part: 'He (the King of Great Britain) has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries.'"

Since the instructions were irrelevant or did not accurately state the law, we find that the trial court's refusal of defendant's instructions was proper.

The last issue in this case is whether defendant, in proceeding pro se, is entitled to have the rules and proce-

dures of law applied less strictly against him. To discuss this issue in its full context, it is necessary to review briefly the fact situation leading up to and throughout this case. Defendant in this case chose to act as counsel on his own behalf. Defendant was not at any time an indigent person entitling him to court-appointed counsel. Throughout the periods for which he was charged, he earned over $10,000 annually. He chose to represent and defend himself, with the advice and help of other tax protestants and with the knowledge that the State would be represented by skilled counsel. The trial judge took numerous occasions to remind him of the consequences of his decision, and the record is replete with instances where the court gave him the benefit of rulings that could well have been decided otherwise. Defendant was further allowed full argument privileges and broad cross-examination. Upon some occasions, defendant's cross-examination became pure argument as to the theory of his own defense. Until the case was closed, every effort was made to assist defendant in submitting his case to the jury.

Several recent opinions of the United States Supreme Court have considered the issue and problems resulting from pro se counsel. In Faretta v. California (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, Mr. Justice Stewart, speaking for the majority in a pro se case where the trial court had forced appellant to take state-appointed counsel, noted at 834:

> "The right to defend is personal. The defendant,
> and not his lawyer or the State, will bear the
> personal consequences of his conviction. It is
> the defendant, therefore, who must be free per-
> sonally to decide whether in his particular case
> counsel is to his advantage. And although he
> may conduct his own defense ultimately to his

own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' [Citation omitted.]

"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently forego those relinquished benefits.' [Citation omitted.]"

Justice Blackman, noting that, in his opinion, no amount of pro se pleading can cure the injury to society of an unjust result, but a "just result should prove to be an effective bomb for any frustrated pro se defendant," closed his dissent as follows:

"If there is any truth to the old proverb that 'one who is his own lawyer has a fool for a client' the Court by its opinion today now bestows a constitutional right on one to make a fool of himself." Faretta, 422 U.S. at 852.

We find, as in Faretta, that a defendant who elects to represent himself cannot complain on appeal that the quality of his own defense acted to his detriment by not amounting to effective counsel. Here, defendant knowingly and intelligently relinquished his right to counsel and proceeded with his defense in his own behalf. He cannot now complain that rules of procedures and law should be applied less strictly against him.

The judgment of the District Court is reversed and remanded for a new trial.

_John Conway Harrison_
Justice

We concur:

_Frank I. Haswell_
Chief Justice

_Gene B. Daly_

_Daniel J. Shea_

_John C. Sheehy_
Justices

-22-