No. 84-351

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

PATRICK JAMES CAMPBELL,

Defendant and Appellant

---

Appeal from:  District Court of the Eleventh Judicial District
In and for the County of Flathead
The Honorable Michael Keedy, Judge presiding.

Counsel of Record:

For Appellant:

Patrick James Campbell, Pro Se, Deer Lodge, Montana

For Respondent:

Honorable Mike Greely, Attorney General, Helena,
Montana
Ted Lympus, County Attorney, Kalispell, Montana

---

Submitted on briefs: October 3, 1985

Decided: December 31, 1985

Filed: DEC 31 1985

_Evelyn M. Harrison_
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Appellant, Patrick James Campbell, appeals his convictions in the Eleventh Judicial District on charges of aggravated assault and theft. Appellant also challenges his designation by the District Court as a dangerous offender and persistent felony offender. Finally, appellant challenges the contempt order that was also issued by the District Court. On this appeal, as at trial, defendant is representing himself.

Appellant purports to raise eighteen issues for our consideration. In his 108-page brief, appellant gives an extremely detailed, though jaded, account of the occurrences during investigation, pretrial and trial. The brief then follows a "shotgun" approach in its utilization of legal arguments--that is, many arguments are thrown out with a chance that the arguments might fit the factual situation of the case. In all of his arguments, appellant misses his mark by either misconstruing the law or not having the facts to fit the law. Although many of the problems with appellant's brief may be partially due to the fact of his pro se representation, a party that relies on his own legal expertise must also accept his own legal weaknesses. See State v. Poncelet (1980), 187 Mont. 528, 610 P.2d 698. We affirm the District Court on all issues.

At this time, in view of the length of time that was required to fully read and consider appellant's arguments and in consideration of the crowding of this Court's docket, we feel compelled to comment that the "shotgun approach" to legal argument is not favored by this Court. Contrived claims confuse the real issues and waste everybody's time,

2

effort and money. That said, we now issue the following opinion with due regard and proper respect for the legal rights and claims of appellant.

Appellant labels his reasons for our granting of relief as follows: (1) impermissible identification evidence; (2) denial of lineup; (3) illegally obtained physical evidence; (4) denial of reliable psychiatric evaluation; (5) denial of change of venue hearing; (6) exclusion of identifiable racial (ethnic) group from jury; (7) cumulative error; (8) failure to fairly and properly instruct jury; (9) insufficient evidence; (10) imprudent denial of motions to dismiss; (11) unconstitutional statutory charges; (12) judicial or prosecutorial overreaching; (13) unlawful predicate for contempt conviction without jury trial; (14) disregard of evidence mitigating punishment; (15) dispensing with constitutional sentencing principles; (16) invalid prior conviction underlying enhanced punishments; (17) collateral estoppel and due process bars to sentencing; and (18) impermissible prosecutorial vindictiveness. We will utilize this same identification of issues as the basis for organizing this opinion.

On July 12, 1983, Betty Huckins drove her car to Rosauer's grocery store in Kalispell, Montana. She parked the car in the parking lot of the store and went inside to shop. Shortly after entering the store, Huckins noticed a stranger attempt to drive her car away. Huckins ran outside and yelled at the man to stop; when he did not, she called the police. During the phone call, Huckins saw her car pull up to one of the entrances to the store and stop. She ran to her car and attempted to get in, but the vehicle moved away before she could enter. During this attempt to recover her

vehicle, she was able to observe the driver from a distance of four to six feet.

Officer Dan Bourne of the Kalispell City Police Department was patrolling the area and noticed the commotion in the parking lot. Upon arriving at the scene, Officer Bourne saw Huckins' car leaving the store's parking lot at a high rate of speed. He pursued the car which then struck a parked car and lodged against another car to which it became attached. Officer Bourne stopped his car and ordered the driver to get out of the Huckins car, but the driver instead tried to free the Huckins car by shifting gears and reving the engine. Officer Bourne then attempted to wrestle the driver from the car. During the struggle, Officer Bourne was able to observe the driver from a distance of one to two feet. In the meantime, the driver was able to free the Huckins car and started down the street again, dragging Officer Bourne with it. Officer Bourne released the driver and fell to the pavement. The fall injured Officer Bourne, but he made it back to his car and resumed pursuit. The driver of the Huckins car turned around and returned southbound in the northbound lane of traffic directly at Officer Bourne. Officer Bourne veered sharply to the right to avoid a head-on collision. The police officer turned around to continue the chase, but by that time he had lost sight of the Huckins car.

In the meantime, Debbie McCartney was listening to a police scanner at her home and heard broadcasts about a car stolen at Rosauer's by a man with a backpack. McCartney had been to Rosauer's that evening, when she had been confronted by a desperate-acting man with an orange backpack asking her directions to Cherry Lane or a similarly-named street. She

phoned the Kalispell Police Department with her information about the man with the backpack.

A couple of hours prior to the car theft, Deputy Updegraff of the Flathead County Sheriff's Office had been summoned to the Somers area in response to a disturbance. During his investigation of the disturbance, Deputy Updegraff encountered a hitchhiker on the highway who possessed an orange backpack and identified himself as Patrick Campbell. The name and a physical description of the hitchhiker was radioed into the sheriff's dispatcher. The hitchhiker then asked Deputy Updegraff for a ride to Cherry Lynn Road in the Kalispell area but the deputy was headed the other direction and refused.

Later than evening, Deputy Updegraff heard the description of the suspect in the car theft broadcast. The deputy recalled his encounter with the hitchhiker and relayed the information from the encounter to the officers searching for the stolen vehicle. The physical descriptions, possession of a backpack, and inquiries by the suspect into the location of Cherry Lynn Road served to link the hitchhiker that had identified himself as Patrick Campbell with the theft of the Huckins car.

The next day Lake County Undersheriff Joe Geldrich in Polson was aware that Patrick Campbell was a suspect in the Kalispell stolen car case and that a warrant had been or was about to be issued for his arrest. Geldrich knew Campbell was staying in Polson and therefore searched around for the stolen car. He found the car in a Safeway parking lot about five blocks from Campbell's brother's house where Campbell was staying. Geldrich then went to the brother's house where he arrested Campbell.

A few hours after the arrest, Campbell was transported to Kalispell where Officer Bourne identified him as the car thief and Deputy Updegraff identified him as the hitchhiker. Both identifications were the products of one-to-one confrontations between the witnesses and suspect. Mugshots were then taken of Campbell.

The mugshots were used several months later in photo displays to Huckins and McCartney. Huckins chose Campbell's photo as the likeness of the man that stole her car and McCartney chose Campbell's photo as the likeness of the man that had asked her directions to Cherry Lane.

Finally, at trial, all four of the above witnesses identified Campbell in person. The identifications were subject to Campbell's cross-examination which did reveal some discrepancies and weaknesses in the identification evidence. The jury, however, evidently did not view these discrepancies as significant because it returned guilty verdicts on both the theft and assault charges.

We will now examine the errors that Campbell alleges occurred at his trial.

1. Impermissible Identification Evidence

Appellant attempts to develop the idea that all of the courtroom identifications by the witnesses are suppressible. He contends the identifications are suppressible because: (1) they are ultimately rooted in an illegal arrest; (2) the Kalispell police failed to conduct a lineup; and (3) the pretrial one-to-one confrontations, mugshot displays and television appearances were impermissibly suggestive. We can find no reversible error in the identification procedures.

6

Appellant makes extensive argument that identification evidence taken via illegal arrest is suppressible. To dispose of this argument, we need go no further than point out that there was nothing illegal about the arrest of appellant. Appellant claims the arrest was warrantless and that there was insufficient probable cause to support a warrantless arrest. However, the record shows that the Kalispell police did have a warrant for the arrest of appellant at the time of arrest. It was not necessary that Undersheriff Geldrich have that warrant in his possession. Section 46-6-203, MCA.

Appellant then argues that the identifications should be suppressed because he was denied a constitutional right to a lineup. Appellant offers no precedent for asserting such a right. We will follow the federal courts of appeal in holding that there is no constitutional right to appear in a lineup. See, United States v. Osterag (8th Cir. 1980), 619 F.2d 767, and United States v. Robertson (9th Cir. 1979), 606 F.2d 853. Moreover, appellant was given a mugshot lineup.

Finally, on the matter of suppression of the identification evidence, appellant asserts that the one-to-one showup identifications by the deputy and police officer, the mugshot display identifications by Huckins and McCartney, and the television appearance by appellant leading to the in-court identification by Reni Mengwasser were impermissibly suggestive. We agree that in criminal proceedings, "due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." State v. Lara (1978), 179 Mont. 201, 204, 587 P.2d 930; Neil v. Biggers (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. In State v. Lara, 587 P.2d at 932, we stated our two-prong test for

7

determining whether or not identification evidence should be suppressed:

> First, was the identification procedure impermissibly suggestive; and second, if so, did it under the totality of the circumstances have such a tendency to give rise to a substantial likelihood of irreparable identification . . .

In applying the first-prong of this test to the identifications by Bourne and Updegraff, we recognize that one-to-one showup identifications are suggestive by their nature. See, State v. Higley (Mont. 1980), 621 P.2d 1043, 37 St.Rep. 1942. However, in this case, the suggestiveness was not impermissive. As such, the identifications fail the first prong of the test for suppression and were admissible. Before proceeding to the identifications by the other witnesses we will enumerate the reasons for this conclusion.

First of all, we do not believe the identifications here were overly suggestive. Officer Bourne and Deputy Updegraff were trained law enforcement professionals that routinely encountered suspects in criminal investigations on a one-to-one basis. As such, they were not as vulnerable to the suggestive nature of the procedure as the general public would be. The suggestiveness was also countered by the fact that they had viewed the suspect close up on the day before the identification. Neither officer was told that the suspect had been identified by anyone else. Under these circumstances, we cannot see where these witnesses were influenced by the suggestiveness of the one-to-one showup.

Moreover, there is another factor here which insured that the due process rights of appellant were protected from the suggestiveness of the identifications--that is, the identification testimony of both Bourne and Updegraff was

8

subject to cross-examination and the weaknesses in the evidence were exposed. The jury was free to award the identification testimony whatever value they thought it worth.

In holding that the one-to-one showup identifications of law enforcement officers were not impermissively suggestive, we make the following cautionary note. The evidentiary value of an identification taken from a proper lineup will always be greater than if it was taken from a one-to-one showup. Law enforcement agencies would be ill advised to rely solely on one-to-one showups in identifying suspects with a crime.

We now apply the two-prong test to the mugshot display identifications by Huckins and McCartney. Appellant claims that because his mugshot was left-profiled rather than right-profiled like the other mugshots in the display, the attention of the viewers was drawn to it. Appellant also claims that the other pictures in the display were unlike his so as to render the display impermissively suggestive. The District Court, after review of the photographs, found these claims unfounded. We agree. The mugshot display was not impermissively suggestive so as to render the identification by Huckins and McCartney inadmissible.

Finally, we reach the identification by Reni Mengwasser. The girl's identification was reported to the police only after she had viewed the suspect on television and her mother told her that he was the one on trial. This identification did not occur until six months after the incident. She testified that she had only seen the suspect incidentally for several seconds at a distance of fifty yards. We believe that this identification procedure was impermissively suggestive under the first prong of our test.

9

We also believe that the totality of the circumstances were conducive to misidentification under the factors considered in judging reliability that we adopted in State v. Higley, 621 P.2d at 1049. Those factors include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention and length of time between the crime and the confrontation. This witness fails all of these factors. As such, the testimony by Reni Mengwasser had a substantial likelihood of misidentification under the second prong of our test and should have been suppressed. The error, however, is harmless as the remaining evidence was sufficient to convict Campbell.

2. Denial of Lineup

We have already disposed of this argument under the first issue. There is no constitutional right to a lineup.

3. Illegally Obtained Physical Evidence

Appellant's backpack was admitted as an exhibit at trial. We need not consider appellant's arguments that the backpack was obtained illegally because having the backpack as an exhibit was not crucial to the case against him.

4. Denial of Reliable Psychiatric Evaluation

Appellant was given one psychiatric evaluation under § 46-14-202, MCA. The statute does not provide for a second evaluation. The District Court did not err in denying his motion for a second evaluation merely because appellant thought the findings of the first evaluation were unfair.

10

5. Denial of Change of Venue

The District Court did not deny appellant's motion for a change of venue. Instead, the record is clear that appellant withdrew his motion for change of venue. The issue is therefore meritless.

6. Exclusion of Identifiable Racial Ethnic Group from Jury

Appellant claims to be 5/32 Flathead Indian and then objects to the exclusion of native Americans from the jury list. We find this issue without merit for three reasons. First, there is no evidence that people of native American descent were not on the jury. Second, there is no evidence that the jury list was made by persons that knew appellant was part Indian. Finally, there is no evidence that there was a systematic effort to exclude people of native American descent from the jury list.

7. Cumulative Error

Appellant alleges that there were fourteen evidentiary errors committed by the District Court and six improper prosecutorial remarks to the jury that in combination suggest that the outcome may have been different if not for the errors and remarks. We have reviewed the transcript for all of the alleged errors. We see little that could be considered error and nothing prejudicial about the rulings of the District Court, individually or cumulatively.

We have also examined the alleged improper prosecutorial remarks. We see nothing in the record of statements by the prosecution but fair comment. The cumulative error claim is thus without merit.

8. Failure to Fairly and Properly Instruct Jury

We find no error among appellant's numerous allegations of improper instructions given to and instructions improperly withheld from the jury. The instructions given were appropriate and according to established law. Appellant's proposed instructions that were not given were either repetitive of instructions given or not in accordance to established law or the evidence in this case.

9. Insufficient Evidence

There is substantial evidence in the record to support the verdict of the jury.

10. Imprudent Denial of Motions to Dismiss

Appellant's motions to dismiss were on the basis of a failure by prosecution to make out a prima facie case. In view of our holding on the sufficiency of the evidence to support a conviction, this issue is without merit.

11. Unconstitutional Statutory Charges

Appellant challenges the terms "reasonable apprehension" in the aggravated assault statute, § 45-5-202, MCA, and "deprive" in the theft statute, § 45-6-301, MCA, as unconstitutionally vague.

The "reasonable apprehension" terms in the statute have been construed by the Court before. See, State v. George (Mont. 1983), 660 P.2d 97, 40 St.Rep. 339; State v. LaMere (Mont. 1980), 621 P.2d 462, 37 St.Rep. 1936.

Section 45-2-101(19), MCA, defines "deprive."

Therefore, these terms do not render the statutes unconstitutionally vague.

12. Judicial or Prosecutorial Overreaching

The record is clear that both the District Court and prosecutor bent over backwards to accommodate the needs and whims of the appellant. Appellant's numerous allegations of prejudicial conduct towards him and false and perjured testimony against him are all without merit.

13. Unlawful Predicate for Contempt Without Jury Trial

Contempt may be punished summarily. Section 3-1-511, MCA. Contempt orders are not appealable. Section 3-1-523, MCA. We need not consider the issue further.

14. Disregard of Evidence Mitigating Punishment

Appellant has presented no evidence that would fit him in the categories of exceptions to mandatory minimum sentences specified in § 46-18-222, MCA. Indeed, the evidence indicates he does not fit the categories. We can find no error.

15. Dispensing with Constitutional Sentencing Principles

The District Court's sentencing order and presentence investigation reflect the judge's conscientious consideration of appellant's history and the facts of this case. The sentence is within statutory limits and the judge's sound discretion. The judge's sentence was correctly imposed.

16. Invalid Prior Conviction Underlying Enhanced Punishment

Appellant claims that his prior felony conviction was invalid because the offense was committed on the Flathead Reservation, but he was convicted in the District Court of the Fourth Judicial District which lacked jurisdiction. This

13

is not the forum for determining whether the court that issued his prior conviction had jurisdiction.

Appellant has a prior felony conviction for the offense of armed robbery for which he was sentenced and incarcerated in the Montana State Prison until his release on July 10, 1981. As such, appellant is a "persistent felony offender" within the meaning of § 46-18-501, MCA.

17. Collateral Estoppel and Due Process Bars to Sentencing

Appellant argues that collateral estoppel and due process bars his status as both a persistent felony offender under § 46-18-501, MCA, and dangerous offender under § 46-18-404, MCA, because the designations serve to sentence him twice for the same offense. There is no merit to the argument.

The dangerous offender status controls parole eligibility and is inapplicable to sentencing. Appellant has not been sentenced twice for the same crime.

18. Impermissible Prosecutorial Vindictiveness

Appellant alleges that the prosecution sought increased sentencing under the persistent felony offender status in a vindictive response to appellant's refusal to plea bargain. The argument is strained and without merit. Appellant chose to plead "not guilty" and to represent himself despite numerous warnings from the prosecution and the judge. Prosecution then sought no greater sentence than is dictated by the statutes. A guilty verdict was returned. Appellant must accept the consequences of that verdict.

Having thus disposed of appellant's issues we will make a further comment on the case. Appellant's involvement in

14

this case from the investigation through the appeal has served to make a simple case complicated. The numerous motions and requests by appellant at the pretrial, trial and sentencing hearing culminating in a lengthy appellate brief have created a tangled mess. The untangling that was done in tracing each of appellant's issues through the record was tedious and time-consuming. One thing became clear early, however. The District Court Judge did a remarkable job in accommodating the whims of the appellant during the proceedings before him. The situation must have been aggravating to say the least, but the judge made certain that appellant's rights were protected. Appellant cannot complain that the judicial system put him in his predicament. He has only himself to blame.

Affirmed on all issues.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

15