No. 88-508

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

RANDALL MARK RUDOLPH,

       Defendant and Appellant.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        William Boggs, Missoula, Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
Robert F.W. Smith, Asst. Atty. General, Helena
Robert Deschamps, III, County Attorney, Missoula,
Montana; Craig Friedenauer, Deputy County Attorney

---

Submitted on Briefs: June 8, 1989

Decided: July 11, 1989

Filed:

_____
          Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Randall Rudolph appeals his conviction of robbery in the Fourth Judicial District, Missoula County. The four issues he raises on appeal are:

1. Was the show-up identification of him as a co-assailant impermissibly suggestive so as to violate his due process rights;

2. Was it an abuse of discretion to deny defendant's protective order regarding witness Trowbridge;

3. Was the State impermissibly allowed to admit into evidence a nondisclosed statement of the defendant;

4. Was it an abuse of discretion to refuse the admission of witness C. Rude's testimony.

We affirm.

On the evening of December 8, 1986, Greg Jasperson was assaulted in downtown Missoula near the corner of Pattee and Main Streets. His assailants, two males of average height and stocky build, beat him until he fell to the ground and then kicked him about the head until he became unconscious. The assailants robbed him of the contents of his pockets and then briskly walked away proceeding south down Pattee Street.

Various stages of this crime were viewed by three eyewitnesses. Witness Thieler came out of the Bon, a nearby clothing store, and got in her car which was in the Bon parking lot. She exited the parking lot onto Pattee Street and immediately noticed two men kneeling over a body on the sidewalk by the Executive Motor Inn. She assumed the two men were aiding the man on the sidewalk until she saw one of the men kick the body with his boot until it rolled into the gutter.

By this time Thieler's car was at the stop sign of Pattee and Main. She watched the two men walk briskly south down Pattee Street. She kept them in sight in her rearview mirror long enough to note that they did not go into the Elks Club, but rather kept

going southward on Pattee toward the Missoula Sheraton. Thieler testified at trial the although she was trying to note where the men went, she momentarily lost sight of them while she turned her head to check for traffic.

Thieler then drove around the block and returned to the Bon to seek assistance for the victim. She enlised the assistance of a man she knew at the Bon. However, by the time they returned to the body, several people were already assisting the victim and she was advised that the police had been called. The police arrived momentarily.

Orlando Gonzales also witnessed part of the crime. Gonzales was walking north on Pattee Street near the Elks Club when he passed by two men going through a wallet. Gonzales assumed that the two were discussing a purchase and were talking about how much money they had.

As Gonzales approached the Executive Inn parking lot, he noticed what appeared to be a "bum" lying in the street. When he got closer, he discovered it was a well-dressed man who had obviously been hurt. He ran into the office of the Executive Inn where the receptionist was phoning the police at that minute.

The third witness was Leon Furnish. He was sleeping in a room at the Executive Inn when he was awakened shortly after 9:00 p.m. by loud cries for help. He ran to the window and on the street below saw two men kicking a man who had fallen to the sidewalk. The victim raised his hands to protect his eyes and teeth and cried, "please don't kick me, why are you kicking me."

The attackers kicked the back, sides and head of the victim. Furnish then saw the assailants search the pockets and take the contents. As they stood up to leave, one of the attackers shoved the body into the street with his boot. They then walked down Pattee Street in a southerly direction and out of Furnish's view. As they walked off, Furnish noted that one man wore a hat of some

type which appeared to have something "flapping" out from underneath it.

Furnish called the hotel desk and told the receptionist to call the police and call an ambulance for the man who had been beaten outside.

The police call came in at 9:15. At 9:18, the police arrived at the scene. By that time, several passers-by had gathered, covered Greg with a sleeping bag and were administering first aid.

The police asked if anyone had seen the attack or noticed anyone leaving the area. Thieler and Gonzales both explained that they saw two men, dressed in heavy dark coats, one with long flowing blonde hair and a cap on and one with dark hair walking south on Pattee. The police left immediately proceeding south on Pattee to search the area.

At the southern end of Pattee Street near the Missoula Sheraton (approximately six blocks away), the police spotted two men, one with dark hair and one with long blonde hair and a black stocking cap. These two men were stopped and questioned by one police officer while another officer returned to the crime scene to question the witnesses.

The two eyewitnesses at the scene, Thieler and Gonzales, were asked if they would go with the police to see if they could identify two men which were stopped by the police. They agreed and were transported by police car, Thieler in the front seat and Gonzales in the back seat. The witnesses were separated by a plexiglass screen and did not confer with one another.

When they reached the Montana Power substation near the Sheraton, where the other patrolman was detaining the two men, Thieler and Gonzales remained in the car. The two men were placed approximately fifteen feet from the front of the patrol car with its headlights shining on them. The two men gave a profile view and view of their backs. Witness Thieler asked if one of them

4

would put his hat back on. The patrolman with the witnesses radioed to the other officer and asked if either suspect had a cap, whereupon Rudolph produced his black stocking cap and donned it.

Thieler then quickly made a positive identification stating that the long blonde hair coming out from under the black stocking cap created the exact figure which she saw.

Gonzales likewise identified the two suspects as the men he passed who were going through the wallet. Gonzales based his identification on the stature and build of the two men as well as the warm, dark clothing they were wearing.

Rudolph was tried separately from the co-defendant and was convicted of robbery by a jury on October 19-21, 1987. He was sentenced to fifteen years in the Montana State Hospital in lieu of prison incarceration. He was also designated a dangerous offender. Rudolph appeals, questioning many procedural aspects of the identification and the trial.

## I. "Show up" Identification

Rudolph asserts that the conviction was based solely on the "show up" identification held that night and that procedure violated his due process rights by being impermissibly suggestive. We disagree.

The importance of the eyewitness identification is under-scored, Rudolph asserts, by the lack of corroborating evidence and inconsistencies in the State's case. All accounts of the incident state that the two assailants proceeded south along Pattee Street walking on the east sidewalk. However, the victim's wallet was found the next day across the street from the attack on the west side of Pattee Street. Witness Thieler admitted losing sight of them momentarily while she looked both ways for traffic at the intersection. The State argued that it must have been just long enough for one of them to dispose of the wallet.

5

The second inconsistency deals with the money stolen from the victim. Jasperson testified that only a small amount of money was stolen: five to eight dollars. However, when stopped just moments after the attack, Rudolph had less than two dollars in his possession.

Thirdly, Rudolph's clothing, a dark green ski jacket, black cap, blue jeans and boots, were not retained by the police for evidence because Rudolph asked to keep his clothes, stating that he had no other clothes with him in Missoula. Thus, when he was released from jail, he was given his clothes. He was then unable to produce them at trial; however, all witnesses, as well as Rudolph, agree to the description of his apparel that night.

Therefore, it was not possible to check the clothing for blood or hair samples, although no blood stains were noted in the police report. The officers testified that they did not recall any blood on Rudolph's clothes or boots that night.

Lastly, at trial Gonzales and Thieler were unable to identify Rudolph by means of a facial photo lineup. Each stated that their identification was based, not on a view of the faces, but rather on stature (height, weight and build), hair (color, length and facial hair), and clothing (style, color, and the cap). Thus, the identification became a key factor in the prosecution's case.

To pass constitutional muster, a pretrial identification must not be (1) impermissively suggestive, nor (2) have such a tendency for misidentification under the totality of the circumstances that it violates due process rights. This two-prong test was set forth in State v. Lara (1978), 179 Mont. 201, 587 P.2d 930, and is controlling on this issue.

In State v. Lara, defendant participated in a "show up" wherein he was identified by the victim as the armed robber involved in a one person robbery of a Laurel food store. The Laurel police apprehended Lara within fifteen to twenty minutes of

the robbery and he was identified by the victim at the scene of the arrest shortly thereafter.

Regarding that identification, we stated:

> Considering the totality of the circumstances we conclude that while the identification procedure was unnecessarily suggestive, it did not create a situation in which there was a substantial likelihood of misidentification and therefore not violative of due process.

Lara, 587 P.2d at 933.

We also find Neil v. Biggers (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, instructive on this issue. Biggers sets forth five factors relating to the circumstances under which pretrial identifications are made. Trial courts should consider the following in evaluating the risk or likelihood of misidentification:

> . . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200.

Thieler's testimony regarding her identification certainly passes any test set up by the Lara case and by the Biggers factors. Thieler stated that she was concerned the attackers would see her watching them, so she drove forward slowly and then proceeded to watch them for several minutes in her rearview mirror. Thus, her opportunity to view the attackers was good, even if she did not view their faces specifically.

Her attention was keen and her description to the police was accurate regarding the assailants' gender, size, hair color and length, and clothing style and color. Also lending credibility to the validity of the identification was the very close proximity in

time and distance from the crime scene. The suspects were apprehended just blocks away from the scene and only moments after the police arrived. Further, all witnesses testified that the downtown streets were deserted that particular winter night, shortly after 9:00 p.m. Not only did they fit the description, the two suspects detained were also the only two pedestrians within many blocks of the crime scene.

Rudolph's own testimony regarding his actions on that night was incredible. Although in the immediate vicinity, Rudolph testified that he had no knowledge whatsoever of the crime, including the fact that he heard no cries for help, no sirens, and saw no lights flashing from emergency help vehicles.

The State concedes that the identification process was suggestive by the mere fact that the two people were stopped so close to the scene, so soon, and that only those two were shown to the witnesses. Indeed, a "show up" identification requiring a "yes or no" answer is a far less desireable situation than positively picking out a person from an anonymous lineup. Biggers, supra; State v. Lara, supra; State v. Campbell (1985), 219 Mont. 194, 711 P.2d 1357, cert. denied, 475 U.S. 1127, 106 S.Ct. 1654, 90 L.Ed.2d 197. As we cautioned in Campbell, "[l]aw enforcement agencies [are] ill advised to rely solely on one-to-one showups in identifying suspects with a crime." Campbell, 711 P.2d at 1362.

Suggestive as it was, based on Lara and the factors set forth in Biggers, we conclude that this identification did not have such a tendency for misidentification so as to violate Rudolph's due process rights under the immediate circumstances of this case.

We conclude the Biggers factors were also met by eyewitness Gonzales and that his identification was also constitutionally-sound. Gonzales did not view them as long as Thieler and his identification seemed apprehensive initially. However, Gonzales passed the suspects on a narrow sidewalk near the crime scene and

observed them long enough and carefully enough to notice their gender, size, clothing and what they were doing. His opportunity to view them and the attention he displayed lend reliability to his identification. Also helpful is the close proximity which was discussed above regarding witness Thieler. We find no error in admitting into evidence the results of this "show up" identification. We note here that witness Furnish did not participate in the identification that night, but he did testify at trial as to what he observed that night.

Lastly, we are not disturbed by the minor discrepancies in the witnesses' descriptions which were asserted by defense counsel. These discrepancies go more to the credibility of each witness and the weight the jury will give their testimony, rather than to the constitutionality of admitting the identification based on varying testimony of other witnesses. See Campbell, supra.

## II. Protective Order

Defense counsel moved for a protective order to conceal the contents of Keith Trowbridge's testimony to prevent the State from "capitalizing" on it by changing their strategy. The motion was denied. We agree.

Keith Trowbridge, an employee of the Firestone Service Station located directly across the west side of the street from the crime scene, would testify that he found the victim's wallet in the alley behind the Firestone property the morning after the robbery. Defense counsel anticipated that the State's case would have Thieler keeping the assailants in constant view on the east side of the street from the time they left the body until they were out of sight. Defense counsel did not want to alert the prosecution to this discrepancy in locations because the police report stated that the wallet was found at the Firestone station and yet the State had not interviewed any of Firestone's employees.

9

Defense counsel makes much of the fact that after this motion was denied, Thieler's testimony was actually that she momentarily lost sight of the two assailants (in which time one of them may have crossed the street). Defense asserts that the issue of continuous or noncontinuous observation by Thieler never would have come up at trial but for the disclosure of witness Trowbridge, and thus his defense was sabotaged. We disagree.

Admitting or refusing evidence lies within the sound discretion of the trial judge. Those rulings will not be overturned unless there is a showing of an abuse of discretion by the trial judge in issuing his ruling. State v. Courville (Mont. 1989), 769 P.2d 44, 46 St.Rep. 338; Cooper v. Roston (Mont. 1988), 756 P.2d 1125, 45 St.Rep. 978. No such showing can be made in this case.

Protective orders should issue when the disclosure of a witness's identity would result in a risk or harm outweighing _any_ usefulness of the disclosure to _any party_. Section 46-15-328(1), MCA. (Emphasis added.) Obviously, there are two flaws with defendant's motion. First, there was no risk or harm to the witness shown by the defense. Indeed, no harm could result to the witness by the disclosure of his identity--as he was already generally identified in the police report and was not in danger.

Secondly, the statute seeks to weigh the usefulness of the disclosure gained by _either_ party. Defense asserted that the harm done to its case was the impeachment of witness Thieler being blunted and that harm far outweighed the disclosure's usefulness. We disagree. As noted by the trial judge, a greater showing of harm or imbalance must be made in order to invoke such an extraordinary restriction. It is obvious from the record the State was aware that the wallet was found at the Firestone Station and could have interviewed the employees had they seen fit to do so. Under these facts, we affirm the trial court's denial of extraordinary relief in the form of a protective order.

### III. Nondisclosed Statement

When questioned as to why Rudolph's clothes were returned to him, rather than seized for evidence, Officer Wicks testified it was because Rudolph stated he had no other clothes in Missoula, all his belongings were in Kalispell. It is undisputed that this hearsay statement by Rudolph previously had not been disclosed and the State fully acknowledges its duty under section 46-15-322(1)(b), MCA, to disclose "all written or oral statements of the accused ..." However, the State asserts that the defense cannot raise the issue of this undisclosed hearsay on appeal because it did not object at trial; or, in the alternative, that the defendant was not prejudiced by allowing the hearsay remark into evidence. We agree.

The verbatim exchange at trial was as follows:

> Q. [By prosecutor Friedenhauer]: Go ahead, why did you release the clothes?
>
> A. [By Officer Wicks]: Mr. Rudolph indicated to me that was the only set of clothes he had in Missoula, that he left all his other belongings behind in Kalispell.

Several questions prior to this exchange, defense objected to the State's line of questioning regarding the co-defendant. The generic objection (which stated no grounds) was overruled by the court. The court, however, went on to admonish the State to limit its questioning to Rudolph only. Whereupon, the exchange in question occurred. We find no basis in the record for defense counsel's assertion that the hearsay statement was admitted over his objection.

No objection by defense counsel was made following this exchange either. Therefore, defendant cannot now claim that the District Court abused its discretion and committed reversible error by allowing the statement into evidence.

## IV.  Testimony Exclusion

Our standard of review for this issue is identical to the previous issue:  an abuse of discretion must be shown before a District Court's ruling on evidentiary questions will be overturned.

Defendant argues that the District Court abused its discretion in refusing to admit the testimony of witness C. Rude.  Defense counsel made an offer of proof in chambers asserting that Rude would testify to his eavesdropping on a conversation which occurred in Missoula during early December 1986.  The conversation related by two men, now in trouble with the Washington state authorities, was regarding a man they had "rolled" in downtown Missoula, taking a small amount of money from the victim.

The District Court analyzed the proposed testimony in relation to the crime with which Rudolph was charged.  The judge found the proposed testimony was too vague regarding the time of the occurrence and the actual crime committed ("rolled" was the best recollection Rude could give and he did not recall the day of the "crime").  Thus, after finding the proposed testimony too tenuous and remote from Rudolph's case, the judge excluded the evidence for failing the relevancy requirements.  We agree.

Relevancy is defined in Rule 401, M.R.Evid., as follows:

> . . . evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rude's testimony sought to exculpate Rudolph by incriminating two other unknown individuals upon whom he had been eavesdropping.

The similarities between the crime overheard by Rude and the one attributed to Rudolph are few:  two men perpetrated the offenses (one dark haired and one blonde), in downtown Missoula, in December of 1986, for a small amount of money.

12

The unknown factors of the evidence include what crime was committed, upon whom, when and by whom. These far outweigh the similarities of the two occurrences. Thus, defense is counsel is unable to prove that the proposed testimony is so close in time, place and similar in style so as to be relevant to the question of Rudolph's innocence or guilt. Absent a closer connection between the two occurrences, or at the very least, a definition of the crime committed by the other unknown assailants, we find no abuse of discretion in refusing this testimony.

In summary, we conclude that the "show up" pretrial identification of Rudolph was constitutionally sound and that the trial court did not abuse its discretion regarding the evidentiary rulings contested at trial.

Judgment affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

13