No. 02-013

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 350

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JAMES DEAN BINGMAN,

Defendant and Appellant.


APPEAL FROM:     District Court of the Eighteenth Judicial District,
                 In and for the County of Gallatin,
                 The Honorable Mark L. Guenther, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

              R. Stan Peeler, Peeler Law Office, Bozeman, Montana

        For Respondent:

              Hon. Mike McGrath, Attorney General; Pamela D. Bucy,
              Assistant Attorney General, Helena, Montana

              Marty Lambert, Gallatin County Attorney, Bozeman, Montana


                                    Submitted on Briefs:  June 13, 2002

                                         Decided:  December 30, 2002

Filed:


        _____
                            Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Appellant James Dean Bingman was convicted of a fourth or subsequent offense of driving under the influence of alcohol in the Eighteenth Judicial District Court, Gallatin County. As the case progressed, Bingman filed several pre-trial and post-trial motions, all of which were denied by the District Court. Bingman was sentenced to thirteen months in the custody of the Department of Corrections for driving under the influence of alcohol, followed by four years of probation. The District Court also designated Bingman a persistent felony offender, sentencing him to twenty years in the Montana State Prison, with ten years suspended, the sentences to run consecutively. Bingman appeals his sentence, as well as the District Court's denial of both his pre-trial and post-trial motions. We affirm the judgment of the District Court.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the District Court err in denying Bingman's motion to exclude witnesses Saylor, Earnest and Lewis from testifying against him at trial?

¶4 2. Did the District Court err in admitting evidence of Bingman's prior convictions of driving under the influence of alcohol?

¶5 3. Was there sufficient evidence to support Bingman's conviction of driving under the influence of alcohol?

¶6 4. Did the District Court err in sentencing Bingman as a persistent felony offender?

## BACKGROUND

¶7 At approximately 5:00 p.m. on September 1, 2000, Officer William Rash received a dispatch concerning a "hit and run" accident in the parking lot of Roskie Hall at Montana State University (MSU) in Bozeman, Montana. Officer Rash responded to the dispatch and encountered several witnesses to the incident, including Sissy Thompson Fears, her daughter Krystal Saylor, and Saylor's friends Tara Earnest and Amber Kappel. Officer Rash interviewed the witnesses and learned that a silver sedan had struck the passenger side of Saylor's vehicle. Saylor's vehicle was parked at the time of the accident, and Saylor was seated in the passenger seat, Earnest was in the driver's seat, Kappel was in the rear seat, and Fears was standing in the parking lot nearby.

¶8 Immediately after the accident, Saylor got out of her vehicle and attempted to speak with the other driver. Saylor's efforts were unsuccessful, however, as the driver was disoriented and unresponsive to her questions. Saylor described the driver as a Mexican or Native American man with dark hair, scraggly facial hair, and several tattoos on his left arm. Saylor also observed that the driver appeared to be missing some teeth. Finally, Saylor noted that the other car's window was rolled down, giving her a clear view of the driver.

¶9 Saylor provided Officer Rash with a description of the driver and his vehicle. Saylor also gave Officer Rash the vehicle's license plate number. When questioned, Earnest, Kappel, and Fears supplied Officer Rash with very similar accounts of the entire exchange. All four women were adamant that the driver was disoriented, and seemed unaware that he had struck Saylor's vehicle. The women also observed that there was a second man in the

3

passenger seat of the other car. Officer Rash ran a registration check on the license plate number provided by Saylor and determined that the vehicle was registered to James Dean Bingman and Cassie Standish. Officer Rash then put out an "attempt to locate" call to other law enforcement units in the Bozeman area.

¶10 Moments after the incident at MSU, Peggy Lewis was driving north on Fowler Lane in Gallatin County, Montana. Lewis noticed that a light-colored car was attempting to run down some pheasants that had wandered into the road. The car swerved into Lewis's lane of traffic at least twice, causing Lewis to veer into the other lane to avoid an accident. The car eventually passed Lewis, and because both her car's window and the other car's window were rolled down, Lewis got an unobstructed view of the other driver. Lewis described the driver as short, with dark hair, a mustache, and a dark complexion. Lewis also noted the car's license plate number, which was identical to the number which Saylor had provided to Officer Rash. Lewis returned home and telephoned the police, informing them of the incident on Fowler Lane.

¶11 At approximately 6:00 p.m., police officers located and stopped the vehicle which matched the license plate number given by both Saylor and Lewis. At the time of the stop, the driver of the car was Kelly McLean. James Dean Bingman was seated in the passenger seat of the car. Both men appeared to be intoxicated, and McLean was arrested for driving under the influence of alcohol. Lewis learned of the stop on her scanner and went to the area of the stop. Lewis informed the officers that the man she observed driving on Fowler Lane

4

was seated in the passenger seat of the car, referring to Bingman. Lewis then left the area of the stop.

¶12     Officer Patrick McLaughlin arrived at the stop and recognized Bingman from previous encounters. Officer McLaughlin, who had spoken with Officer Rash, transported Bingman to MSU, as Bingman matched the description of the driver in the MSU incident. As Officer McLaughlin drove past Lewis's home, Lewis came out to speak with him. Lewis informed Officer McLaughlin that his passenger was the man driving the car during the incident on Fowler Lane, again referring to Bingman.

¶13     Upon his arrival at the MSU police department, Bingman was advised of his *Miranda* rights, which he waived. Bingman then gave a taped statement to Officer Rash. In his statement, Bingman admitted that he had been drinking, but denied having driven during either the MSU or Fowler Lane incidents. Officer Rash noted that Bingman had bloodshot eyes, slurred speech, and smelled strongly of alcohol. At Officer Rash's request, Saylor and Earnest were waiting at the police department at MSU. After viewing Bingman through a two-way glass window, both Saylor and Earnest immediately identified Bingman as the man that had been driving during the MSU incident.

¶14     On September 19, 2000, the Respondent, State of Montana, filed an information charging Bingman with driving under the influence of alcohol, fourth or subsequent offense, a felony, in violation of § 61-8-401, MCA (1999). Bingman pled not guilty to the charge on February 14, 2001. On February 20, 2001, the State filed notice of its intent to seek treatment of Bingman as a persistent felony offender. Bingman filed two pro se motions to

5

dismiss on March 8, 2001, and March 28, 2001, and a pro se motion to dismiss witness testimony on March 27, 2001. Bingman also filed a pro se motion to dismiss for lack of evidence on April 10, 2001. On April 30, 2001, Bingman's newly-assigned counsel filed a motion to exclude witnesses Saylor, Earnest and Lewis from testifying against Bingman at trial.

¶15 The District Court conducted hearings on Bingman's pre-trial motions on May 11, 2001, and May 14, 2001. The District Court denied Bingman's motions on August 22, 2001. The case proceeded to jury trial on August 27, 2001. On August 28, 2001, the jury returned a verdict of guilty. Bingman filed a sentencing memorandum on September 12, 2001, urging the District Court to sentence him as a non-violent felony offender. On October 23, 2001, Bingman was sentenced to thirteen months in the custody of the Department of Corrections, followed by four years of probation. The District Court also designated Bingman a persistent felony offender, sentencing him to twenty years in the Montana State Prison, with ten years suspended, the sentences to run consecutively.

¶16 Bingman filed a notice of appeal on October 25, 2001. On October 25, 2001, Bingman also filed a motion in the District Court for stay of execution of sentence pending appeal. On November 9, 2001, Bingman filed a motion with the District Court for reconsideration of his sentence. The District Court denied Bingman's post-trial motions on November 16, 2001. Bingman filed an amended notice of appeal on December 21, 2001, in which he appealed his sentence, as well as the District Court's denial of both his pre-trial and post-trial motions.

**STANDARD OF REVIEW**

¶17     This Opinion addresses multiple issues, and as such, the appropriate standard of review for each issue will be set forth immediately preceding discussion of that issue.

**DISCUSSION**

**ISSUE 1**

¶18     Did the District Court err in denying Bingman's motion to exclude witnesses Saylor, Earnest and Lewis from testifying against him at trial?

¶19     We treat a district court's denial of a motion to suppress the testimony of a witness as a ruling on the admissibility of evidence. *State v. Scarborough*, 2000 MT 301, ¶ 62, 302 Mont. 350, ¶ 62, 14 P.3d 1202, ¶ 62. Our standard of review for a district court's evidentiary rulings is abuse of discretion. Absent a showing of such abuse we will not overturn the district court's decision. *Scarborough*, ¶ 62.

¶20     Bingman contends that the District Court improperly admitted witness testimony from Saylor, Earnest and Lewis at trial. Specifically, Bingman asserts that Saylor and Earnest's observation of him though a two-way window at the MSU police department was impermissibly suggestive, resulting in an unreliable identification. Bingman also alleges that Lewis's observation of him in Officer McLaughlin's vehicle was impermissibly suggestive, resulting in an unreliable identification. The State counters that the certainty of the witnesses' identifications outweighs the likelihood that Bingman was misidentified.

¶21     Saylor, Earnest and Lewis identified Bingman on September 1, 2000, the date of both the MSU and Fowler Lane incidents. To determine the admissibility of an in-court

identification based upon a pretrial identification, this Court applies a two-part test. *State v. Clark*, 2000 MT 40, ¶ 19, 298 Mont. 300, ¶ 19, 997 P.2d 107, ¶ 19. First, we determine whether the pretrial identification procedure was impermissibly suggestive. *Clark*, ¶ 19. If the identification procedure is deemed impermissibly suggestive, we then evaluate whether, under the totality of the circumstances, the procedure had such a tendency to give rise to a substantial likelihood of irreparable misidentification that to allow the witness to make an in-court identification would result in a violation of due process. *Clark*, ¶ 19.

¶22     Saylor and Earnest identified Bingman after observing him through a two-way window at the MSU police department. Bingman was the only suspect on his side of the window, resulting in a "show-up" form of identification. This Court has previously recognized the suggestive nature of one-on-one "showup" identifications. *See State v. Rudolph* (1989), 238 Mont. 135, 141, 777 P.2d 296, 300. Further, the State concedes that the identification procedure utilized by the MSU police department in this case was in fact impermissibly suggestive. As such, the identification procedure satisfies the first part of the pretrial identification test. We now turn our attention to the second part of the test.

¶23     The second part of the pretrial identification test requires this Court to "determine whether, under the totality of the circumstances, the identification procedure gave rise to a substantial likelihood of irreparable misidentification." *Clark*, ¶ 21. The factors to be considered in evaluating the likelihood of misidentification are as follows:

  1. The opportunity of the witness to view the criminal at the time of the crime;

  2. The witness' degree of attention;

3. The accuracy of the witness' prior description of the criminal;

4. The level of certainty demonstrated by the witness at the confrontation; and

5. The length of time between the crime and the confrontation.

*Clark*, ¶ 21.

¶24 In the instant case, both Saylor and Earnest had ample opportunity to view Bingman at the time of the incident at MSU. Further, Saylor had a conversation with Bingman, albeit short, immediately after Bingman's vehicle struck her vehicle. Earnest observed this conversation from several feet away. Additionally, the descriptions that Saylor and Earnest provided to Officer Rash were both accurate and consistent. In fact, when police officers eventually stopped Bingman's vehicle, they concluded that Bingman matched the physical description given to them by Saylor and Earnest.

¶25 Furthermore, Saylor and Earnest immediately identified Bingman upon viewing him through the two-way window at the MSU police department. Officer Rash testified that Saylor and Earnest did not talk amongst themselves before providing their identifications, and that both women were certain that Bingman was the man driving the other vehicle at MSU. Finally, Saylor and Earnest identified Bingman only hours after the incident at MSU.

¶26 The certainty with which Saylor and Earnest identified Bingman outweighs the likelihood that Bingman was misidentified. Therefore, despite the impermissibly suggestive nature of the "showup" identification procedure, we conclude that under the totality of the circumstances, the procedure did not create a substantial likelihood of misidentification.

¶27 Witness Lewis identified Bingman after observing him in the back seat of Officer McLaughlin's patrol vehicle. Bingman alleges that such an observation was impermissibly suggestive, resulting in an unreliable identification. This Court has previously determined pretrial identifications, in which the suspect was either in or near a patrol car at the time of the identification, to be unnecessarily suggestive. *See State v. Lara* (1978), 179 Mont. 201, 587 P.2d 930, *and Rudolph*, 238 Mont. 135, 777 P.2d 296. Our inquiry does not end there however. Under the second part of the pretrial identification test, we must determine "whether, under the totality of the circumstances, the identification procedure gave rise to a substantial likelihood of irreparable misidentification." *Clark*, ¶ 21.

¶28 In the instant case, Lewis's identification of Bingman was voluntary. Officer McLaughlin testified that he was transporting Bingman to the MSU police department when Lewis approached his vehicle. Officer McLaughlin noted that he did not question Lewis about Bingman, but rather received unsolicited information from Lewis. Officer McLaughlin further testified that upon viewing Bingman, Lewis clearly identified him as the driver of the vehicle involved in the incident on Fowler Lane. Finally, Lewis's identification of Bingman occurred within hours of her encounter with Bingman on Fowler Lane.

¶29 Bingman maintains that despite Lewis's voluntary identification, she had only moments to view the driver of the car on Fowler Lane, and as such, her identification was unreliable. However, while Lewis's encounter on Fowler Lane may have been brief, the certainty with which she identified Bingman outweighs the likelihood that Bingman was misidentified. Accordingly, we conclude that despite the suggestive nature of Lewis's

10

observation of Bingman in a patrol vehicle, under the totality of the circumstances, such observation did not create a situation in which there was a substantial likelihood of misidentification. As such, the District Court did not err in denying Bingman's motion to exclude witnesses Saylor, and Earnest and Lewis from testifying against him at trial.

## ISSUE 2

¶30 Did the District Court err in admitting evidence of Bingman's prior convictions of driving under the influence of alcohol?

¶31 We review a district court's evidentiary rulings to determine whether the district court abused its discretion. *State v. Gooding*, 1999 MT 249, ¶ 11, 296 Mont. 234, ¶ 11, 989 P.2d 304, ¶ 11. A district court has broad discretion to determine whether evidence is relevant and admissible. Absent a showing of abuse of discretion, we will not overturn a court's evidentiary determination. *Gooding*, ¶ 11.

¶32 Bingman contends that testimony concerning his two most recent convictions for driving under the influence of alcohol was improperly admitted at trial. Bingman supports this contention with Rule 609, M.R.Evid., which provides that: "For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is not admissible." Bingman alleges that pursuant to Rule 609, M.R.Evid., the State was barred from using his prior convictions to attack his credibility.

¶33 This Court addressed a nearly identical situation in *State v. Austad* (1982), 197 Mont. 70, 641 P.2d 1373. In *Austad*, the defendant was convicted of a number of charges, including aggravated burglary. *Austad*, 197 Mont. at 77-78, 641 P.2d at 1377. The defendant appealed

11

his conviction, asserting that the trial court erred in admitting evidence of his prior felony conviction for burglary. *Austad*, 197 Mont. at 75, 641 P.2d at 1376. The relevant portion of the defendant's trial testimony from *Austad* is as follows:

Q. Did you burglarize Mabel Wald's house?

A. No.

Q. How do you know?

A. I don't - because it is not part of me to do that type of thing. I've been in trouble with the law before, *but I've never burglarized any place*.

Q. Have you ever been convicted of a felony?

A. Yes.

. . . .

Q. What was the conviction for?

A. *Burglary*.

*Austad*, 197 Mont. at 88, 641 P.2d at 1383.

¶34 This Court examined the defendant's testimony and noted that pursuant to Rule 404(b), M.R.Evid., "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Austad*, 197 Mont. at 89, 641 P.2d at 1384. This Court further noted that the list of exceptions in Rule 404(b), M.R.Evid., is not an exclusive list, as the Commission Comments following Rule 404(b), M.R.Evid., state that: "Montana law is consistent with the concept that purposes other than

12

those listed in the rule may be found and used to admit evidence of other crimes." *Austad*, 197 Mont. at 90, 641 P.2d at 1384. We concluded in *Austad* that evidence of defendant's prior felony conviction was admitted for the purpose of proving *not* that the defendant committed the crimes of which he was charged, but that the defendant had lied under oath. *Austad*, 197 Mont. at 90, 641 P.2d at 1384.

¶35 This Court also examined the prohibition against testimony of prior convictions found in Rule 609, M.R.Evid., and stated that: "the rule springs from a concern that witnesses will be caused undue pain and embarrassment, even discouraged from testifying, although the prior conviction may have no relation to credibility." *Austad*, 197 Mont. at 90, 641 P.2d at 1384. We concluded that the circumstances in *Austad* were "obviously not those contemplated by Rule 609," as the defendant in *Austad* answered a question on cross-examination "with an unnecessary, self-serving statement which he knew to be untrue, intended to place him in a better light with the jury." *Austad*, 197 Mont. at 90, 641 P.2d at 1384. We further concluded that: "The Rules of Evidence were not intended to muzzle the State against [a] defendants' deliberate attempts to mislead jury members by lying to them in answering specific questions." *Austad*, 197 Mont. at 90, 641 P.2d at 1384. As such, we held that the trial court did not err in admitting the defendant's own testimony regarding his prior burglary conviction. *Austad*, 197 Mont. at 90, 641 P.2d at 1384.

¶36 In the instant case, the District Court found that it was Bingman's own testimony which "opened the door" to evidence of his past convictions. The relevant portion of Bingman's testimony at trial is as follows:

Q.  Did you or did you not state, on direct examination, 'after I drink, I won't drive my vehicle.'  Did you say that?

A.  After I drink, I will not drive my vehicle.  That is true.

. . . .

Q.  Mr. Bingman, to clarify your statement, you indicated, 'after I drink I won't drive my vehicle.'  I ask you, was that true simply on September 1st of 2000?

A.  As I stated before, that was an agreement made between me and [my girlfriend] Cassie as - concerning the vehicle and our relationship.

Q.  So, that agreement only existed on that particular day or that particular time frame?

A.  No, that agreement existed from the time [I] got together with her in January and went all the way up until probably May of 2001.

Q.  Okay, but you were –

A.  When Cassie left me and I took the vehicle back.

Q.  But you were arrested and charged with driving under the influence in January of 2001; were you not?

. . . .

A.  I believe that I was.

Q.  Okay. And you were, in fact, convicted of that offense, correct?

A.  I pled guilty to it because it was a misdemeanor and Cassie was in the car with me and she knew that I was having a beer.
Q.  And in 1998, I believe you also had another DUI, is that right?

A.  '98 no, I did not.

Q.  The one in Gallatin County here, that you –

A.  I didn't have one in '98.

14

Q. Was it '99?

A. I believe there was one in '99.

Q. Okay, and you were – you pled guilty to that offense as well, correct?

A. Yes, I did.

¶37 Bingman, like the defendant in *Austad*, provided the jury with self-serving statements that he knew to be untrue, which were intended to place him in a better light with the jury. As such, the testimony at issue in the instant case is not the sort of evidence contemplated by Rule 609, M.R.Evid., which prohibits the admission of evidence that a witness has been convicted of a crime for the purpose of attacking that witness's credibility. Bingman's initial statement, that "after I drink, I won't drive my vehicle," was provided during direct examination. This statement was not solicited by the State to attack Bingman's credibility. Furthermore, the testimony elicited from Bingman during cross-examination, concerning Bingman's prior convictions, was admitted for the sole purpose of proving that Bingman had lied while under oath. As such, we adopt the reasoning of *Austad* and conclude that the District Court did not err in admitting Bingman's own testimony regarding his prior conviction of driving under the influence of alcohol in January of 2001.

¶38 As to the conviction in 1999, Bingman alleges that if this Court were to adopt the reasoning of *Austad*, such reasoning would permit the admission of evidence of his conviction from 2001, but not his conviction from 1999. The State counters that Bingman's testimony "opened the door" to both of his previous convictions. The State further asserts

15

that if the 1999 conviction was erroneously admitted, such admission amounted to harmless error.

¶39 On direct examination, Bingman stated that: "I had made a deal with my girlfriend that I would not drink and drive her vehicle. And it was actually both our vehicle but I had given it to her." Bingman later testified on direct examination that: "After I drink, I won't drive my vehicle so I would have walked across the street to my house and gave the keys to Cassie and asked her to pick up the car. I've done it a hundred times. She has no problem with that as long as I don't drive."

¶40 On cross-examination, Bingman reaffirmed his statement that "after I drink, I won't drive my vehicle." The State pressed for clarification on this issue, asking "was that true simply on September 1st of 2000?" Bingman responded by stating that: "that was an agreement made between me and Cassie as - concerning the vehicle and our relationship." Bingman further testified that: "the agreement existed from the time [I] got together with [Cassie] in January and went all the way up until probably May of 2001."

¶41 Immediately after the State questioned Bingman about his prior convictions, Bingman again qualified the limits of his ban on drinking and driving. The relevant portion of Bingman's trial testimony is as follows:

> Q. So, the statement that, "after I drink, I won't drive my vehicle" didn't apply in those other occasions [referring to Bingman's 1999 and 2001 convictions], did it?
>
> A. It applied while me and Cassie - that I would not drink and drive a vehicle, or Cassie's vehicle and my vehicle . . . .
>
> Q. Okay.

A.  So, the agreement was only made for - between me and my girlfriend as a -
for us.

¶42    At no time during trial did Bingman state that he *never* drank alcohol while driving a vehicle.  Bingman's testimony regarding his ban on drinking and driving was uttered solely in the context of an agreement he had made with his girlfriend Cassie.  That is, Bingman testified that his ban on drinking and driving was in effect as a result of his relationship with Cassie.  Bingman further testified that the ban was no longer in effect when his relationship with Cassie terminated.  Consequently, the statements made by Bingman at trial only "opened the door" to convictions for driving under the influence of alcohol which occurred during Bingman's relationship with Cassie.

¶43    Bingman indicated that his agreement with Cassie began in January.  It is unclear from the trial transcript which year Bingman was referring to.  Bingman asserts on appeal that he began his relationship with Cassie in January of 2000.  As such, there is no evidence before us upon which we can conclude that Bingman made his agreement with Cassie *before* January of 2000.  Accordingly, Bingman's statement regarding his ban on drinking and driving only "opened the door" to evidence of his conviction for driving under the influence of alcohol in January of 2001.  Therefore, evidence of Bingman's 1999 conviction for driving under the influence of alcohol was erroneously admitted at trial.

¶44    In *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, we set forth a test for determining whether an error prejudiced a defendant's right to a fair trial and is therefore reversible.  The type of error at issue in the instant case is trial error.  *Van Kirk*, ¶ 40.  Pursuant to *Van Kirk*, trial error is "not presumptively prejudicial and therefore not automatically reversible." *Van Kirk*, ¶ 40.  In the instant case, evidence of Bingman's 1999 conviction was not related to an essential element of the crime charged.  Neither was

17

evidence that Bingman had lied while under oath. In cases where the tainted evidence does not go to the proof of an element of the crime charged, "the State must demonstrate that the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence and, qualitatively, by comparison, the tainted evidence would not have contributed to the conviction." *Van Kirk*, ¶¶ 46-47.

¶45 The record is absent of other admissible evidence which tends to prove that Bingman was convicted in 1999 for driving under the influence of alcohol. However, evidence of Bingman's 1999 conviction was not elicited to prove that Bingman had a prior conviction for driving under the influence of alcohol. Such evidence was elicited to prove that Bingman had lied while under oath. Bingman's 2001 conviction for driving under the influence of alcohol was *also* offered to prove that Bingman had lied while under oath. Consequently, Bingman's 2001 conviction proved the same fact as the tainted conviction from 1999.

¶46 As we stated above, the State must prove that "qualitatively, there is no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction." *Van Kirk*, ¶ 47. The jury had before them evidence of Bingman's 1999 conviction for driving under the influence of alcohol. The jury also had before them evidence that Bingman was convicted of driving under the influence of alcohol in 2001. Evidence of both convictions was offered to prove that Bingman had lied while under oath. However, there is no reasonable possibility that the jury would have acquitted Bingman had he lied only once while under oath, instead of twice. As such, we hold that in comparison to the admissible evidence concerning the 2001 conviction, there is no reasonable possibility that evidence of the 1999 conviction contributed to Bingman's conviction in the instant case. The District

18

Court's admission of evidence of Bingman's conviction from 1999 amounted to harmless error.

## ISSUE 3

¶47　Was there sufficient evidence to support Bingman's conviction of driving under the influence of alcohol?

¶48　We review the sufficiency of evidence to support a jury verdict to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bauer*, 2002 MT 7, ¶ 15, 308 Mont. 99, ¶ 15, 39 P.3d 689, ¶ 15.

¶49　The elements of the offense of driving under the influence of alcohol are enumerated in § 61-8-401(1)(a), MCA (1999), which provides, in pertinent part: "It is unlawful and punishable, for a person who is under the influence of alcohol to drive or be in actual physical control of a vehicle upon the ways of this state open to the public." Additionally, § 61-8-401(3), MCA (1999), provides that: "'Under the influence' means that as a result of taking into the body alcohol, drugs, or any combination of alcohol and drugs, a person's ability to safely operate a motor vehicle has been diminished."

¶50　Bingman contends that insufficient evidence existed to support his conviction for driving under the influence of alcohol on September 1, 2000. We disagree. The facts surrounding both the MSU and Fowler Lane incidents were largely undisputed at trial. Bingman himself admitted to encountering the women at MSU, and to the possibility that his vehicle had struck Saylor's vehicle. Bingman also testified that his vehicle had swerved

19

around a group of pheasants on Fowler Lane. Further, although Bingman originally informed Officer Rash that he was not driving during either the MSU or Fowler Lane incidents, Bingman later admitted at trial that he was in fact driving his car during both incidents. Accordingly, Bingman's own testimony leaves little doubt that he was driving his vehicle shortly before it was stopped by police officers on September 1, 2000.

¶51 Ample evidence also existed which tended to prove Bingman's intoxication. Officer McLaughlin testified that when he encountered Bingman at the police stop, Bingman appeared to be extremely intoxicated. Officer McLaughlin noted that Bingman smelled strongly of alcohol and that his eyes were very bloodshot. Finally, Officer McLaughlin testified that Bingman walked to the patrol car in an unstable manner. Officer Rash also testified as to his belief that Bingman was intoxicated on September 1, 2000. Officer Rash stated that Bingman's eyes were bloodshot, and that his speech was slurred. Furthermore, all four of the women who witnessed the incident at MSU testified at trial that Bingman was disoriented and appeared to be intoxicated when his vehicle struck Saylor's vehicle.

¶52 Bingman himself admitted to consuming six beers in the morning hours of September 1, 2000. Bingman also testified that before the police stop, but after the MSU and Fowler Lane incidents, he consumed three more beers and two shots of alcohol. Utilizing Bingman's own time-line of the events on September 1, 2000, the State then proved that were Bingman's testimony correct, he would have consumed those five drinks in a fifteen-minute period.

¶53 The State asserted at trial that Bingman's time-line was fabricated to disguise the fact that he consumed alcohol during the afternoon of September 1, 2000, before driving his

20

vehicle on the MSU campus and on Fowler Lane. The testimony of Officers McLaughlin and Rash, as well as the testimony of Saylor, Earnest, Kappel and Fears, all served to corroborate the State's assertion that Bingman was under the influence of alcohol during both the MSU and Fowler Lane incidents. Therefore, although the State may not have proven Bingman's level of intoxication with specificity, it was certainly possible for the jury to conclude that Bingman was under the influence of alcohol when he drove his vehicle on September 1, 2000. Accordingly, we hold that sufficient evidence existed to support Bingman's conviction.

## ISSUE 4

¶54 Did the District Court err in sentencing Bingman as a persistent felony offender?

¶55 Whether a prior conviction can be used to enhance a criminal sentence is a matter of law. *State v. Jackson*, 2002 MT 212, ¶ 7, 311 Mont. 281, ¶ 7, 54 P.3d 990, ¶ 7. Our standard of review for a district court's conclusions of law is plenary and we must determine whether the court's conclusions are correct as a matter of law. *Jackson*, ¶ 7. When reviewing a district court's findings of fact, we must determine whether those findings are clearly erroneous. *Jackson*, ¶ 7.

¶56 On appeal, Bingman contends that the District Court erroneously sentenced him as a persistent felony offender under §§ 46-18-501, 502, MCA. Bingman supports this contention with the facts of *State v. Guillaume*, 1999 MT 29, 293 Mont. 224, 975 P.2d 312. Bingman further maintains that his conviction in 1986 for felony assault was constitutionally infirm.

¶57     The State filed notice of its intent to seek treatment of Bingman as a persistent felony offender on February 20, 2001. Bingman responded by filing a post-conviction sentencing memorandum on September 12, 2001. However, Bingman's sentencing memorandum made no reference to *Guillaume*, and contained no allegations regarding the infirmity of his 1986 felony conviction. Bingman also failed to make these arguments at his sentencing hearing on October 23, 2001. Rather, in Bingman's sentencing memorandum, and at his sentencing hearing, Bingman urged the District Court to sentence him as a non-violent felony offender. Finally, Bingman asserted no argument based upon the facts of *Guillaume*, or the infirmity of his 1986 conviction, in his motion for reconsideration of sentence on November 9, 2001.

¶58     Accordingly, Bingman raises this issue for the first time on appeal. It is well stated that we will not address issues raised for the first time on appeal. *See State v. Kober*, 1999 MT 264, ¶ 11, 296 Mont. 425, ¶ 11, 989 P.2d 399, ¶ 11. As such, we decline to address Bingman's allegation that he was improperly sentenced as a persistent felony offender.

¶59     For the foregoing reasons, the judgment of the District Court is affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART

22

Justice Terry N. Trieweiler concurring and dissenting.

¶60     I concur with the majority's resolutions of issues one, three and four.

¶61     I concur with the majority's conclusion under issue two that James Dean Bingman's conviction for driving under the influence of alcohol in 2001 was admissible to impeach his direct testimony, but that his 1999 conviction for the same offense was beyond the scope of his direct testimony, did not contradict anything that he said, and should not have been admitted as evidence.

¶62     I dissent from the majority's conclusion that evidence of Bingman's 1999 conviction was harmless error and I disagree with the majority's harmless error analysis.

¶63     Because the admission of inadmissible evidence during trial is not structural and because the inadmissible evidence at issue in this case was not offered to prove an element of Bingman's alleged crime, the following test is applicable from *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735:

> [I]n those cases where the tainted evidence does not go to the proof of an element of the crime charged, and there is no other admissible evidence tending to prove the particular fact at issue, the admission of the tainted evidence will be deemed harmless only if the State demonstrates that no reasonable possibility exists that the admission of the tainted evidence might have contributed to the defendant's conviction.

*Van Kirk*, ¶ 46.

> Thus, restated, we hold that, in order to prove that trial error was harmless, the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction. . . . If the evidence in question did not prove an element of

23

the crime, then the State must demonstrate that, qualitatively, there is no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction.

*Van Kirk*, ¶ 47.

¶64 Evidence of prior offenses or convictions is inadmissible for a reason. The evidence is prejudicial and highly likely to influence the jury's verdict. That is why Rules 404(b) and 609 of the Montana Rules of Evidence prohibit evidence of prior bad acts and criminal convictions.

¶65 In this case, Bingman was charged with driving under the influence of alcohol, yet the State proved not just one prior criminal conviction for the same offense, but two. While the 2001 conviction was arguably admissible to impeach Bingman, the 1999 conviction was not admissible and the cumulative effect of proving that Bingman had twice before been convicted of the very offense with which he was charged would undoubtedly have influenced the jury's perception of him and his denials in this case.

¶66 The majority concludes in ¶ 45 that the evidence of Bingman's 1999 conviction was not offered to prove that he had previously driven under the influence of alcohol but that he lied under oath. While that may have been the prosecutor's intention, that is not what the evidence established because at no time did Bingman testify that he didn't drink and drive prior to 2000 when he met his girlfriend, Cassie.

¶67 The majority also concludes in ¶ 45 that Bingman's inadmissible 1999 conviction proved the same thing as his 2001 conviction. Again, I disagree. His 2001 conviction proved that he

24

testified incorrectly on direct examination. Evidence of his 1999 conviction did not. All the 1999 conviction proved was that he had been previously convicted of driving under the influence of alcohol in 1999.

¶68 In ¶ 46, the majority Opinion states that:

> However, there is no reasonable possibility that the jury would have acquitted Bingman had he lied only once under oath, instead of twice. As such, we hold that in comparison to the admissible evidence concerning the 2001 conviction, there is no reasonable possibility that evidence of the 1999 conviction contributed to Bingman's conviction in the instant case.

¶69 I'm not sure what the quoted part of the majority Opinion means. However, if it is the premise for its conclusion, then its conclusion is invalid. The majority Opinion seems to suggest that the 2001 conviction was offered to prove that Bingman lied once under oath, the 1999 conviction was offered to prove that he lied a second time under oath, and that proving that he lied twice is no more prejudicial than the proof that he lied once. However, the 1999 conviction wasn't offered to prove that Bingman lied twice. The State sought to prove that Bingman lied <u>once</u>, when he testified that since his arrangement with Cassie he doesn't drink and drive. However, it did so with two prior examples of drinking and driving—one which contradicted his testimony and one which did not. The one which did not simply proved his character. That is inadmissible and prejudicial. Furthermore, this part of the majority's analysis more properly relates to inadmissible evidence which proves an element of the crime charged. There the question becomes whether the evidence duplicates some other evidence of the

25

same fact.  Here the prior conviction for DUI did not prove an element of the crime and the only question is whether there was a reasonable possibility that it contributed to the conviction.  I conclude that there is and would, therefore, reverse the judgment of the District Court.

¶70  For these reasons, I both concur with and dissent from the majority Opinion.

/S/ TERRY N. TRIEWEILER

26